UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONNA CLAES,

                      Plaintiff,

    -v-                                      5:14-CV-774

BOYCE THOMPSON INSTITUTE FOR
PLANT RESEARCH,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                  OF COUNSEL:

THE LAMA LAW FIRM                     LUCIANO L. LAMA, ESQ.
Attorneys for Plaintiff
2343 N. Triphammer Road
Ithaca, NY  14850

NIXON PEABODY LLP                     TODD R. SHINAMAN, ESQ.
Attorneys for Defendant
1100 Clinton Square
Rochester, NY  14604


DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On June 25, 2014, plaintiff Donna Claes ("plaintiff" or "Claes") initiated this action, which arises from the 2013 transfer of her employment position within defendant Boyce Thompson Institute for Plant Research ("defendant" or "the Institute"). She brings one federal claim pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 ("ADEA"), and one state claim for the intentional infliction of emotional distress

("IIED").[1] Plaintiff seeks injunctive relief reinstating her original employment position as well as back pay, compensatory damages, and attorneys' fees and costs.

On July 28, 2014, the Institute filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule __").  After plaintiff was granted several extensions of time to respond to defendant's motion, she filed a cross-motion seeking leave to file an amended complaint pursuant to Rule 15(a)(2) and a memorandum in support of the proposed amended complaint.  Defendant replied and opposed the cross-motion.  Both motions were considered on submit, without oral argument.

## II. FACTUAL BACKGROUND

The following facts, taken from the proposed amended complaint, are assumed true for purposes of the motion to dismiss.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

By 2013, Claes—who was over forty years old—had worked as the Executive Assistant to the Institute's President, David Stern ("President Stern"), for over thirteen years.  She consistently received positive performance evaluations throughout her employment.

In April 2013 Claes attended a Senior Leadership Team meeting with President Stern, Chief Financial Officer Sophia Darling ("CFO Darling"), Chief Operations Officer and Vice President of Operations Joan Curtis, Vice President Bridgette Rigas, and Vice President Eric

---

[1] In the first three paragraphs of the proposed amended complaint, plaintiff also invokes Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII").  However, there is no delineated cause of action for an alleged Title VII violation.  Nor does plaintiff discuss a Title VII claim in her motion papers.  Therefore, it is assumed that she asserts only an ADEA claim and an IIED claim.

- 2 -

Richards.[2] During this meeting President Stern stated that he wanted someone "younger with fresher ideas" in plaintiff's position. Proposed Am. Compl. ¶ 15. Also during the meeting, CFO Darling encouraged plaintiff to consider "doing something else within the company." Id. ¶ 17. Plaintiff advised that she was content in her current position.

In a one-on-one conference after the meeting, CFO Darling again "strongly advised" Claes to consider a transfer. Id. ¶ 20. Plaintiff understood that her employment would be terminated if she did not agree to a transfer. She was advised to contact Susan Hartman ("Hartman"), a consultant for the Institute, to discuss the issue further. Hartman informed plaintiff that President Stern described the Executive Assistant position as "evolving." Id. ¶ 23. Plaintiff reaffirmed her desire to remain in her current position. Nonetheless, in the face of "intense pressure," plaintiff reluctantly requested a transfer to a position in the Intellectual Property/Technology Transfer Office on May 20, 2013. Id. ¶ 28.

On July 11, 2013, Claes received an email from CFO Darling advising that her request for transfer to a Technology Transfer Specialist position had been officially approved. She was assured that her salary, pay grade, and full-time employment status would not change. Before plaintiff began her new position in October 2013, the Institute hired Vanessa Greenlee ("Greenlee") to fill her Executive Assistant position. Greenlee was approximately thirty years old at the time and had no prior experience in the field.

---

[2] In the proposed amended complaint, plaintiff first alleges that this meeting took place in April 2012 but later reports that it occurred in April 2013. Proposed Am. Compl. ¶¶ 15, 66. Plaintiff's affidavit indicates the meeting occurred in 2012. Claes Aff. ¶ 2. However, the EEOC Right to Sue letter only discusses events taking place in 2013, suggesting the meeting occurred in April 2013. The confusion created by plaintiff is inexplicable, especially in light of the importance afforded to this meeting and its temporal proximity to her alleged adverse employment action. However, at the motion to dismiss stage, where all reasonable inferences must be made in plaintiff's favor, it is assumed that this meeting occurred in April 2013. This matter shall be conclusively resolved during discovery.

On October 2, 2013, Claes received a letter signed by CFO Darling and the Director of Intellectual Property, Paul Debbie ("Director Debbie"). This letter again acknowledged her transfer and reflected that her current salary would remain at $60,725.[3] However, the letter also noted that she had "resigned" from her position as Executive Assistant on May 20, 2013, and indicated that her performance would be assessed quarterly, the need for her new position would be reevaluated in September 2014, and her salary may be subject to change in October 2014.

On October 7, 2013, in response to this letter, Claes emailed CFO Darling, Director Debbie, and the Principal Liaison for Technology Marketing and Licensing, Karen Kindle, and noted her disagreement with the suggestion she had "resigned" from her prior position. She also objected to the quarterly performance assessments and the possible change in salary in October 2014—both of which she claims were not discussed with her prior to the October 2 letter. CFO Darling replied by informing plaintiff that she had voluntarily requested the transfer and cautioned that her new position and salary could not be guaranteed beyond October 2014. Plaintiff became concerned about her new position, and discussed the terms of that position with Director Debbie on October 17, 2013.

When Claes arrived at work on the morning of October 18, 2013, she noticed that CFO Darling and Director Debbie were already in the office. Plaintiff characterizes this early arrival as atypical and claims to have become so emotionally upset that she immediately went home. She still had remote access to President Stern's email and checked his messages from her home. She discovered an email from Human Resource Manager Jane

---

[3] Although plaintiff's salary remained the same, she reports that her new position was within "Pay Band 3" whereas her prior Executive Assistant position was within "Pay Band 4." Proposed Am. Compl. ¶ 37.

Calder, who recommended that plaintiff's employment with the Institute be terminated. Plaintiff subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which found no evidence that her age was a factor in her employment transfer and issued a Right to Sue letter in April 2014. In September 2014 the Institute offered Claes a new position, which combined two part-time positions and was within Pay Band 3. She reportedly remains employed with the Institute.

## III. DISCUSSION

Generally, Claes alleges that the Institute and its administration pressured her into reluctantly requesting a job transfer and structured her new position in such a manner as to gradually phase her out of the Institute. She claims this was done due to her age. Defendant argues that the complaint must be dismissed, and leave to file the proposed amended complaint must be denied as futile, because plaintiff did not suffer an adverse employment action (ADEA claim) and there is no extreme and outrageous conduct alleged (IIED claim).

### A. Cross-Motion to Amend

Leave to amend a pleading should be freely given "when justice so requires." FED. R. CIV. P. 15(a)(2). Where a plaintiff seeks to amend her complaint while a motion to dismiss is pending, a court "has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." Roller Bearing Co. of Am., Inc. v. Am. Software, Inc., 570 F. Supp. 2d 376, 384 (D. Conn. 2008) (internal quotation marks omitted).

As the Institute had sufficient opportunity to respond to the proposed amended complaint, and Claes does not seek to add new defendants or causes of action, the merits of

the motion to dismiss will be considered in light of the proposed amended complaint. If the proposed amended complaint cannot survive the motion to dismiss, then plaintiff's cross-motion to amend will be denied as futile. See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002).

### B. Rule 12(b)(6) Motions to Dismiss—Legal Standard

The Institute argues that leave to file the proposed amended complaint must be denied because it fails to state any claims upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), more than mere conclusions are required. Indeed, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims. See Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face"). When considering a motion to dismiss, the complaint is to be construed liberally, all factual allegations are to be deemed true, and all reasonable inferences must be drawn in the plaintiff's favor. Chambers, 282 F.3d at 152. Finally, a district court may consider documents attached to the complaint as exhibits or incorporated by reference therein. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

### C. ADEA Claim

The Institute argues that Claes's ADEA claim fails because plaintiff did not suffer an

adverse employment action.

To establish a *prima facie* age discrimination claim under the ADEA, Claes must show:  (1) she was within the protected class; (2) she was qualified for the position of Executive Assistant; (3) she was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  See Carlton v. Mystic Transp. Inc., 202 F.3d 129, 134 (2d Cir. 2000). Further, plaintiff must demonstrate that her age was the "but-for" cause of the adverse action.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176–77 (2009).

An adverse employment action is "a materially adverse change in the terms and conditions of employment."  Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted).  For example, a materially adverse change includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Id. (internal quotation marks and ellipsis omitted).

A "constructive discharge" may also constitute an adverse employment action.  A constructive discharge occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir. 2007) (per curiam) (internal quotation marks omitted); see also Caskey v. Cnty. of Ontario, 560 F. App'x 57, 59 (2d Cir. 2014) (summary order).  The working conditions must be so objectively intolerable "that a reasonable person in the employee's shoes would have felt compelled to resign."  Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (internal

quotation marks omitted).

Claes maintains that her transfer request was not entirely voluntary in that she felt pressured to transfer at the risk of being terminated. She further claims her new position as Technology Transfer Specialist was less distinguished, less secure, and included an almost certain pay cut after the first year. She concludes that she suffered a "constructive demotion" and that her new position amounted to a materially adverse change in the terms and conditions of employment. The Institute claims plaintiff was not subject to a constructive demotion because she voluntarily requested the employment transfer. Alternatively, they assert that the terms and conditions of her employment did not change as her salary, full-time status, and benefits package remained unchanged and she was not formally demoted.

### 1. Constructive Demotion

The Second Circuit has not explicitly recognized and applied the doctrine of constructive discharge to scenarios in which an employee accepts a transfer of employment. However, various district courts in this circuit and several other circuit courts have persuasively explained the reasoning behind such application. See Sebold v. City of Middletown, No. 3:05-CV-1205, 2007 WL 2782527, at *13 (D. Conn. Sept. 21, 2007) ("A voluntary transfer can constitute an adverse employment action if it amounts to a constructive discharge."); Chanval Pellier v. British Airways, PLC., No. 02-CV-4195, 2006 WL 132073, at *4–5 (E.D.N.Y. Jan. 17, 2006) (collecting cases from the Fifth, Seventh, and Eighth Circuits applying the constructive discharge analysis to voluntary employment transfers).

Therefore, Claes's voluntary transfer to the position of Technology Transfer Specialist may constitute an adverse employment action if she can show the Institute intentionally

created conditions so difficult or unpleasant that a reasonable person in her shoes would have been compelled to request and accept the transfer. After accepting as true the factual allegations detailed in the proposed amended complaint, plaintiff has adequately alleged that she suffered a constructive demotion.

During a Senior Leadership Team meeting in April 2013, President Stern announced his intention to find someone "younger with fresher ideas" to replace Claes. It is reasonable to infer that President Stern—as plaintiff's immediate supervisor and the head of the Institute—had final decision-making power over such employment decisions. According to plaintiff, it became clear that she was no longer wanted in the position of Executive Assistant. On at least two separate occasions, CFO Darling strongly advised her to consider a new position within the Institute.

Claes was later instructed to speak with Hartman, a consultant working with the Institute and President Stern. Hartman described the Executive Assistant position—which plaintiff had performed well for over thirteen years—as "evolving." This reinforced plaintiff's belief that President Stern intended to replace her despite her stated desire to remain in the position. Plaintiff implies that she was repeatedly advised to seek a transfer until she reluctantly relented in May 2013 to avoid termination, which she believed would be otherwise inevitable.

In the face of repeated pressure over the course of one month[4] from three separate

---

[4] Again, it is assumed the Senior Leadership Team meeting—at which defendant began pressuring plaintiff to request a transfer—took place in April 2013. If this meeting occurred in April 2012, as confusingly alleged in the proposed amended complaint, such would undermine plaintiff's claim that the conditions of her employment were so intolerable as to leave her with no choice but to request a transfer. See Sebold, 2007 WL 2782527, at *14 (rejecting claim of constructive discharge where plaintiff endured the work environment for over two years before requesting a transfer); Cecil v. U.S. Postal Serv., 03 Civ. 8404, 2004 WL 1886202,
(continued...)

persons with administrative authority over her employment, a reasonable person in plaintiff's shoes would have felt compelled to request the transfer rather than risk termination. See Rother v. N.Y.S. Dep't of Corr. & Cmty. Supervision, 970 F. Supp. 2d 78, 95 (N.D.N.Y. 2013) (Kahn, J.) ("A constructive-discharge claim may also lie where an employee resigns in the face of an impending and inevitable termination." (citing Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."))).

Accordingly, Claes has plausibly alleged that she suffered a constructive demotion.

### 2. Materially Adverse Change in Terms and Conditions

The Institute next argues that even if Claes's transfer was involuntary, the terms and conditions of her employment did not change. Defendant's assertion that plaintiff did not suffer a materially adverse change in the terms and conditions of her employment because her salary and benefits did not immediately change and she was not formally demoted oversimplifies her allegations. Other indices unique to this particular situation exist from which it can be reasonably inferred that she suffered a materially adverse change in the terms and conditions of her employment.

Claes was promised that her salary, pay grade, and full-time employment status would not change in her new position. However, after her transfer was formally approved but shortly before she began the new position, she received a letter signed by CFO Darling and Director Debbie advising that the need for her new position would be reevaluated in

---

⁴(...continued)
at *2 (S.D.N.Y. Aug. 24, 2004) ("[T]he fact that nearly a year passed between the start of [plaintiff's] sick leave and his date of retirement makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." (internal quotation marks omitted)).

September 2014 and her salary may be subject to change in October 2014. The letter also indicated that her performance would be assessed quarterly in her new position, a condition she was not subject to in her Executive Assistant position. Further, her new position was within Pay Band 3 whereas her prior position was in Pay Band 4.

The addition of such terms and conditions, which plaintiff reports had not been discussed prior to her transfer request and approval, supports an inference that her new position had been structured in such a manner as to allow the Institute to gradually phase her out and terminate her employment. It is similarly reasonable to infer that the position of Technology Transfer Specialist is less distinguished and contemplates lesser responsibilities than the Executive Assistant to the President.

In short, Claes plausibly alleges that she suffered a materially adverse change in the terms and conditions of her employment when she transferred from the Executive Assistant position to the Technology Transfer Specialist position. See Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir. 1999) ("To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement.").

Accordingly, the Institute's motion to dismiss the ADEA claim will be denied.

### D. IIED Claim

The Institute argues that the IIED claim must be dismissed because Claes fails to allege sufficiently extreme or outrageous conduct on behalf of the involved employees and administrators. Plaintiff does not respond to this argument.

In order to plead a plausible IIED claim under New York law, a plaintiff must allege:

"(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citing Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993)). Whether the alleged conduct may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance. See Howell, 81 N.Y.2d at 121.

Plaintiff's attempt to state a claim for IIED falls woefully short of this demanding standard. The only incident that allegedly produced a "high state of emotional distress" occurred on the morning of October 18, 2013. Proposed Am. Compl. ¶ 79. According to plaintiff, she arrived at work before 9:00 a.m. to find Director Debbie and CFO Darling already at the office. This purported "atypical" behavior on the part of these two administrators triggered such an emotional response in Claes that she "turned around and went home." Id. ¶¶ 78–79. The fact that Director Debbie and CFO Darling arrived at work prior to 9:00 a.m. is simply not extreme or outrageous. Nor can it reasonably be inferred that these administrators intended such conduct to cause plaintiff distress or recklessly ignored the possibility that arriving early could trigger such distress.

Accordingly, the Institute's motion to dismiss the IIED claim will be granted.

## IV. **CONCLUSION**

Liberally construing the proposed amended complaint and making all reasonable inferences in plaintiff's favor, Claes has adequately pleaded an ADEA claim against the Institute. Accepting her allegations as true she plausibly alleges that she was subject to a constructive demotion that led to a materially adverse change in the terms and conditions of

her employment. However, she fails to plead sufficient allegations to sustain an IIED claim.

Therefore, it is

ORDERED that

1. Plaintiff Donna Claes's cross-motion for leave to file an amended complaint is GRANTED;

2. The Clerk of the Court is directed to file the Amended Complaint as the operative pleading;

3. Defendant Boyce Thompson Institute for Plant Research's motion to dismiss is GRANTED in part and DENIED in part;

4. The first cause of action for a violation of the Age Discrimination in Employment Act remains;

5. The second cause of action for intentional infliction of emotional distress is DISMISSED; and

6. Defendant shall file an answer to the first cause of action in the Amended Complaint on or before March 13, 2015.

IT IS SO ORDERED.

_____
United States District Judge

Dated: February 27, 2015
      Utica, New York.